BERGER & MONTAGUE, P.C.
Todd S. Collins, Esq.
Eric Lechtzin, Esq.
Russell D. Paul, Esq.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Phone: (215) 875-3000
Fax: (215) 875-4604
E-mail: tcollins@bm.net
E-mail: elechtzin@bm.net
E-mail: rpaul@bm.net

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT E. HERNREICH, AS TRUSTEE FOR THE ROBERT E. HERNREICH 2005 TRUST, and SERURE SCOUT LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>JAMES C. HECKMAN, JR., MARK STIEGLITZ, STEVE RINDNER, WILLIAM C. SORNSIN, JR., and ROSS LEVINSOHN<br><br>Defendants. | Case No.: _____<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Robert E. Hernreich as Trustee of Robert E. Hernreich 2005 Trust, and

Serure Scout LLC ("Plaintiffs"), purchased securities issued by Scout Media Holding, Inc.

("Scout" or the "Company") in 2014 and 2015, and allege the following based upon

information and belief, except as to those allegations concerning Plaintiffs, which are based

upon personal knowledge. Plaintiffs believe that substantial additional evidentiary support

will exist for the allegations set forth in this Complaint after a reasonable opportunity for

discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this lawsuit against Defendants James Heckman, Mark Stieglitz, Steve Rindner, William Sornsin, and Ross Levinsohn for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants are the former senior officers and directors of Scout.

2.      Scout is a bankrupt Delaware corporation that was originally incorporated under the name North American Membership Group, Inc. ("NAMG") on October 4, 1999. Pursuant to an Amended and Restated Certificate of Incorporation filed on March 4, 2015, the name of the Company was changed to "Scout Media Holdings, Inc." At all times relevant to this action, Scout maintained its principal place of business at 122 West 26th Street, Fifth Floor, New York, New York.[1]

3.      Before its insolvency, Scout described itself as: "a digital multi-channel, male-focused video network, providing authentic targeted content from our team of 300+ press credentialed journalists and sports experts across the nation." Scout boasted "12,000+ stories and thousands of videos produced every month," which focused on "NFL, fantasy sports, college football and basketball, high school recruiting, hunting, fishing, military, gear, and much more."[2]

4.      Defendants induced Plaintiffs to purchase Scout securities by representing that Scout was a profitable company with a valuation of approximately $108 million, and

---

[1] Scout is the sole member or stockholder, as applicable, of the following subsidiaries: Scout Media, Inc., a Washington corporation, FTFS Acquisition, LLC, a Delaware limited liability company, and Scout.com, LLC, a Washington limited liability company.

[2] *See* Scout website, at: http://www.scout.com/corporate/3/about.html.

that Plaintiffs' investments in Scout would enable the Company to become even more profitable, thus increasing the value of Scout securities.

5.      Unbeknownst to Plaintiffs, the rosy image of Scout depicted by Defendants was a sham. In reality, Scout was in complete disarray. By July 2014, Scout was running out of cash and was not paying its vendors or even paying the rent on its Minnesota offices, which housed its critical customer billing and data servers as well as its financial systems. The only way for Scout to escape its death spiral was to solicit regular cash infusions from investors, including Plaintiffs.

6.      Among other things, Defendants failed to disclose to Plaintiffs that they were closing the Company's magazine business and that the associated revenue would be lost. In reality, Scout had realized between $5 to $8 million in losses.

7.      According to a July 12, 2016 article in The New York Post, Scout descended into "chaos" when, on July 10, 2016, the Company announced that James Heckman had been fired with "cause…" Mass resignations of production team members followed amidst claims that: "Recently, Russian investors executed a hostile takeover of our company. James Heckman was removed from leadership and the board installed unqualified junior employees to steer the company." The Russian telecom executive Ivan Vladimirovich Tavrin of MegaFon was said to be leading the Russian investors' takeover.[3]

8.      On December 8, 2016, Scout filed a voluntary Chapter 11 bankruptcy petition. *See Scout Media Holdings, Inc.*, Bankruptcy Petition No. 1:16-bk-13424-MEW (S.D.N.Y.). Additionally, a related involuntary Chapter 11 petition brought by LSC Communications, Inc., On Safari Foods, and Imatch Services, LLC was commenced on

---

[3] The July 12, 2016 New York Post article is available at: http://nypost.com/2016/07/12/scout-media-ceos-firing-prompts-mass-resignations/.

December 1, 2016. *See Scout Media, Inc.*, Bankruptcy Petition No. 1:16-bk-13369-MEW (S.D.N.Y.).

9.     Following these revelations, Heckman told *Media Ink* in an e-mail: "Given the direction things ended up going, we're all just so happy to be moving on with our lives and honored we were able to preserve the entire core team." Heckman added: "We're going to build something incredible together, free of the Russians, debt, the acrimony, and ineptitude — it's such a relief."

10.     On February 7, 2017, the U.S. Bankruptcy Court for the Southern District of New York entered an order approving the sale of substantially all the assets of Scout. Pursuant to this order, Scout was authorized to sell substantially all its assets to CBS 247 Inc.

11.     Each of the statements Defendants made to Plaintiffs in order to induce them to purchase shares of Scout securities, and upon which Plaintiffs relied in making such purchases of Scout securities, was materially false and misleading because such statements (and material omissions) failed to disclose the following: (1) at all relevant times Defendants were planning to abandon (and eventually did abandon) the Company's legacy print business, which was its main source of revenue; (2) the Company's Commerce Back Office ("CBO") system failed to operate properly, which prevented it from billing Scout's existing customers and sustaining the Company's revenue; (3) because of the foregoing, the Company was running out of cash; (4) due to the Company's dwindling cash reserves, it was perpetually on the brink of breaching covenants with its principal lender Multiplier Capital, which would trigger a default and sink the Company; and (5) Defendants lacked any reasonable basis for their financial projections, which they knew to be false.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

13.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5).

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects, including the preparation and dissemination to Plaintiffs of materially false and misleading financial statements, occurred in this District.

15.     In connection with the acts, omissions and other wrongs complained of herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

16.     Plaintiff Robert Hernreich, as Trustee for the Robert E. Hernreich 2005 Trust ("Hernreich"), purchased 396,825 shares of the Company's Series C preferred stock on October 24, 2014, and 198,412 shares of Series C-1 Preferred Stock in March 2015, and has suffered economic harm as a result of the disclosure of the wrongful acts of Defendants as alleged herein.

17.     Plaintiff Serure Scout LLC ("Serure") is a New York limited liability company that was formed for purposes of investing in Scout. On or about September 25, 2015, Serure purchased shares of the Company's Series C-1 Preferred Stock through an entity called Scout Investment, LLC, for $2,400,000. Serure has suffered economic harm as a result of the disclosure of the wrongful acts of Defendants as alleged herein.

18.     Defendant James C. Heckman, Jr. ("Heckman") was, at all times relevant to this action, Chief Executive Officer of Scout. As CEO, Defendant Heckman directed the day-to-day operations of the Company and was responsible for its decision to abandon its legacy print business, among other ill-fated decisions. Heckman drafted, reviewed, approved and signed certain of Scout's false and misleading financial statements, reports, and other communications complained of herein, which were relied upon by Plaintiffs. Heckman also served as Manager of Scout Investment, LLC, the entity through which Serure acquired its Scout securities.

19.     Defendant Mark Stieglitz ("Stieglitz") was, at all times relevant to this action, the Chief Operating Officer of Scout. Stieglitz drafted, reviewed, approved and signed certain of Scout's false and misleading financial statements, reports, and other communications complained of herein, which were relied upon by Plaintiffs.

20.     Defendant Steven Rindner ("Rindner") was, at times relevant to this action, the Chief Strategy Officer of Scout. Rindner drafted, reviewed, approved and signed certain of Scout's false and misleading financial statements, reports, and other communications complained of herein, which were relied upon by Plaintiffs. Rindner also served as Manager of Scout Investment, LLC, the entity through which Serure acquired its Scout securities.

21.     Defendant William C. Sornsin, Jr. ("Sornsin") was, at times relevant to this action, the Chief Technology Officer of Scout. Sornsin drafted, reviewed, approved and signed certain of Scout's false and misleading financial statements, reports, and other communications complained of herein, which were relied upon by Plaintiffs.

22.     Defendant Ross Levinsohn ("Levinsohn") was, at times relevant to this action, the Executive Chairman of Scout. Levinsohn is named as a Defendant only with respect to Count II, which assert a claim pursuant to Section 20 of the Exchange Act.

23.     Unless otherwise stated, the term "Defendants," as used herein, refers to Defendants Heckman, Stieglitz, Rindner and Sornsin.

24.     Defendants, as senior executive officers of Scout, were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, Plaintiffs.

25.     It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's financial statements, projections, business plans, and presentations to investors and other materials, as alleged herein, is the collective product of the narrowly defined group of defendants identified above. Each of the above officers of Scout, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

26.     Defendants participated in the drafting, preparation, and/or approval of the various shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Scout,

Defendants had access to the adverse undisclosed information about Scout's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Scout and its business issued or adopted by the Company materially false and misleading.

27.     Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of the various statements to Plaintiffs pertaining to the Company at all times relevant to this lawsuit. Each Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Defendant is responsible for the accuracy of the reports and financial statements detailed herein and is therefore primarily liable for the representations contained therein.

28.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Scout's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived Plaintiffs regarding Scout's business, operations, management and the intrinsic value of Scout's securities; and (ii) caused Plaintiffs to purchase Scout's securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Unveiling the New Scout Network

29.     While the Company's print media business was well-established and had a dependable revenue stream, Defendants were more interested in selling investors on their new "Scout Network," which the Company launched in June 2014 at the Cannes Lions International Festival of Creativity, in Cannes, France. Defendants touted the major investment in this new media business by Robert Pittman's investment fund, Pilot Group.

30.     In press releases and other media outlets, Scout announced that it would debut the Scout Network in September 2014 with "over $100 million in assets, consisting of premium, all-owned, highly engaging content and commerce properties for men, along with over 300 sports, outdoors and military Web properties, 21 million customers, three television shows, 38 magazines and a robust commerce enterprise."

**Defendants Aggressively Solicited Hernreich's Investments**

31.     Plaintiff Hernreich met Defendants while traveling in France in 2014. Thereafter, Defendants immediately began to aggressively pursue Hernreich to invest in the Company, then known as North American Membership Group, Inc. ("NAMG").

32.     Over the next several months, Heckman pitched the idea of Hernreich investing in the Company through an investment round that he was then promoting – the Series C Preferred Stock sale. Heckman told Hernreich how NAMG had acquired Scout in 2013 with the intention of building a digital media business on the strong foundation of NAMG's legacy print media business.

**The Company's Series C Preferred Stock Offering**

33.     The Company's Series C Preferred Stock offering was intended to raise $15 million through the private sale of nearly 5 million shares of the Series C Preferred Stock. This preferred stock offering targeted large investors who would each enter into a separate purchase agreement with the Company.

34.     On May 7, 2014, Defendants Heckman and Rindner provided Hernreich proposed terms for the sale of Series C preferred stock.

35.     With respect to potential investors, including Hernreich, Defendant Stieglitz advised Heckman: "[O]ne thing they want to see right now is current cash forecasting. I sent you a few choices in email as to what to tell them." However, disclosing the Company's true cash position was the last thing Defendants wanted to do. Instead, Defendants plied Plaintiffs with fictitious cash forecasting, which Defendants knew to be unrealistic and unattainable.

**Defendants Make Massive Cuts to Comply with Debt Covenants**

36.     Under the Company's Loan Agreement with Multiplier Capital, the Company received $7 million on November 15, 2013. The Multiplier Capital loan had a maturity date of November 15, 2017. Pertinent to this action, the Multiplier Capital Loan Agreement required the Company to maintain through June 15, 2015, at least $1 million in unrestricted cash in demand deposit accounts.

37.     In order to comply with the cash reserve requirement of the Multiplier Capital Loan Agreement, Heckman proposed making massive layoffs at the Company's Minnetonka, Minnesota office.

38.     Specifically, in a May 13, 2014 email, Heckman implored Stieglitz, "**I want you to think deeply about possible more cuts.** [W]e're going deep on media strategy, **so make sure that you're committed to more cuts if possible**." (Emphasis added).

39.     In response, Defendant Stieglitz warned: "[J]ust scared to broadly cut in MN before we know CBO is working. **[T]his is our revenue stream and if it breaks we don't know who we will need to fix it fast or patch until it is fixed.**" (Emphasis added). Stieglitz was referring to employees in the Minnesota [MN] office who were responsible for the Company's critical Commerce Back Office ("CBO") operations, which was the core system that directed shipments of so-called "continuity products" (primarily print media publications) to the Company's members.

40.     On May 20, 2014, Stieglitz reiterated his warning to Heckman not to terminate employees in the Minnesota office, because it would jeopardize the Company's primary source of revenue. However, Heckman disregarded this advice and instructed Sornsin to immediately terminate most of the Minnesota employees so that the Company would have sufficient working capital until the closing of the Series C Preferred Stock offering to avoid a covenant default under the terms of the Company's Loan Agreement with Multiplier Capital.

41.     On May 29, 2014, Sornsin advised Heckman that he had carried out Heckman's request and terminated most of the CBO employees. This move proved fateful.

**Defendants Conceal the Truth About Scout's Financial Condition**

42.     Unbeknownst to Hernreich, while Defendants were courting his investment in Scout, they were covering up the grave threat posed to the Company's critical financial systems resulting for the undisclosed Minnesota layoffs, as such personnel were needed to keep Scout's CBO operational so that Scout could bill customers for services ordered, process shipments, and many other functions that were integral to maintaining Scout's revenue. The Company's dwindling cash position was another impending crisis. As a result of these circumstances, by June 2014, Defendants were in a state of panic.

43.     By June 6, 2014, Stieglitz described the non-functioning CBO situation as a "disaster," and stated that the Company was losing $600,000 per week ("[R]ight now we are unable to bill about $600K a week.")

44.     In a July 9, 2014 email to Sornsin, Stieglitz acknowledged that the Company had begun to wind down the print media business in March 2014, and the revenue from this business was already tanking as a result, stating: "[W]e stopped acquisition direct mail after February/March which I suspect is the primary cause of the May dropoff. June is probably most[ly] CBO."

45.     As revealed in an email string entitled "**NAMG Confidential**", by July 2014 the Company was down to $1.2 million in cash reserves and in danger of breaching its covenants on the Multiplier Capital loan. Moreover, Scout had stopped all payables to vendors. The Company's new receivables management technology was not working, which was adversely and materially affecting cash collections, and a potentially lucrative deal with Clear Channel was on the rocks.

46.     With respect to revenue, Heckman sounded the alarm in a July 11, 2014 email to Scout's Senior Vice President of Marketing Freddie Laker entitled, "**revenue crisis in your department – haven't seen any actual reaction; at all (other than grief).**"

Defendants Stieglitz, Sornsin and Rindner were copied on this email. In this email, Heckman demanded an explanation for the drop in monthly sales revenue from $1.5 - $2 million to $23,000, and stated that the Company had lost $3 million since May. He then berated Laker for not pursing Scout's customers via email. Specifically, Heckman wrote:

> Hey Freddie. Love you. **Were you aware our sales dropped from 1.5MM in continuity to $23,000?** These are all direct mail related. Do we have any plan to generate revenue for continuity from digital? We've had club websites live now for four months - are we doing continuity offers through e-mail? we have millions of e-mail addresses; what's the plan? have we sent continuity offers? commerce offers? anything to replaced [sic.] the lost direct mail revenue? Do our mailings include asking for e-mail address, so we can follow-up with them via e-mail? just hard to believe that when print mailings stopped, by now, we weren't aggressively pursuing our millions of members via e-mail, given we have such a huge number of matches. Why didn't we immediately send e-bills to our current users? **literally, we've lost $3MM in cash since May**, and I've not seen any reaction, any back-up plan, any urgency or digital action as a back-up plan. What is the plan? **I know I'm abusing you often Freddie - but do love you. But the abuse will continue until I see some revenue coming from any initiate [sic] created by you.** So far, 100% of the revenue under your oversight comes from the old model. at-least I thought you'd have implemented a plan for our users with e-mail addresses.
>
> When you spent weeks in Minnetonka, I assumed you were forming a transition plan to digital, at-least would have started the process to incrementally move all users willing to pay via e-mail. It costs nothing, so why am I seeing no movement at all.
>
> \*\*\*\*\*
>
> **Your #1 and only mission described in-depth in your contract was to boldly transfer our engagement with our paying members from paper mail to e-mail and digital** - what the fuck is happening.
>
> The other situation - which I appreciate you admitted to me - is that **we wasted over $1MM in a mailing of magazines**, with the sole purpose of moving people to the websites. Why weren't we prepared to answer the phones? Why was this not one of the most exciting times in our company.
>
> \*\*\*\*\*
>
> **Not only does it appear there was no plan, no engagement in the campaign, no leadership, no training but there appears to be no engagement with the members now.** My request when you arrived was to fire or redeploy marketing people from minn, to focus the on digital

marketing. You have several interns with college educations in our office- why would they not be engaged with the transition plan- the most important part of your job.

(Emphasis added).

47.     Freddie Laker's response to Heckman's tirade is illuminating, as he explains that he was unable to move the company to a digital platform because the Company lacked sufficient resources to implement any digital sales and marketing plan, and the Company abruptly shut down its only source of revenue (its print media business) before it had a viable digital sales and marketing platform. Specifically, Laker told Heckman:

> **We don't have a revenue crisis - we have a resource crisis.**
>
> I have plans coming out of my ears but we can't execute on anything in a timely manner. I'm a team player and I'm trying to work with what's been given to me, but the reality is I get table scraps for technical resources to get things done because we have so many things we were trying to get done at one time. **Simultaneously we're trying to conserve cash and turning off all our existing offers because we don't want to or can't afford to pay for them.**
>
> I have stressed multiple times that **I would prefer to have had new initiatives in place before turning off our old revenue generating initiatives**, but I've tried to support the company cash flow strategy.
>
> **Combined this with pulling the plug in our billing platform and then being disabled for two months and we're not looking too pretty.**
>
> I don't like to complain. I don't like people that make excuses which is why you never here [sic] me make any but **I won't be faulted for strategic decisions being made in the company** that are outside my control.

(Emphasis added.)

48.     Pertinent to Plaintiffs' claims, Laker recognized that Defendants were selling investors on a sham business, stating:

> **We are not the company that you're selling to people** yet but we can by launch.

(Emphasis added.)

49.     Laker then explained to Defendants that their decision to shut down the CBO had caused the Company's precipitous drop in revenue, stating: "**Yes, that will happen when you turn off acquisition and billing at the same time.**" (Emphasis added). He also told Defendants that the Company failed to generate revenue from continuity digital because it was forced to shut down its CBO when the Company failed to pay its bills: "**Yes, we have a huge digital initiative for acquisition. We turned it off too because we owe them over $1mm**." (Emphasis added).

50.     With respect to the Company's revenue shrinking to only $23,000 for the month, Laker pointed out that this was the foreseeable result of shutting off the old sales platform without a digital replacement, stating: "**How do you think the decision to turn off acquisition or disable billing might play into that number? Do you think not having any digitally lead programs up to replace that revenue might be bad?**" (Emphasis added.)

51.     Defendant Sornsin also elaborated on Scout's revenue disaster, stating:

> **Scout has no paper billing capability, and the vast majority of club membership bills are paper. Obviously those are in CBO**… and those are the people you want to flip online… so CBO needs to know if they pay online so it doesn't double-bill.

(Emphasis added.)

52.     In a July 18, 2014 email, Heckman acknowledged to Stieglitz, Rindner and Sornsin that shutting down the old billing system was a mistake, stating:

> **Look at the numbers; the drop was to the floor.** We actually were beating our numbers. Churning existing and not prospecting was producing great cash
>
> Tying big cash drop to change of business, "in May to June" is flat out wrong and misleading in a dangerous way
>
> **This needs to be corrected instantly**
>
> Our strategy of billing proven buyers produced cash, didn't reduce cash

> Please fix. This error hurts us and ignores the point if our strategy that was working

> **Not billing or shipping at all. Pretty much is all you need to say**

(Emphasis added).

## Defendants' False and Misleading Representations to Plaintiff Hernreich

53.     On July 23, 2014, Heckman emailed Hernreich audited financial statements of the Company for 2012 and 2013, unaudited financial statements for the first six months of 2014, and financial projections for 2014 and 2015. With respect to these financial statements, the Series C Preferred Stock Purchase Agreement provided to Hernreich falsely represented that they were correct and fairly represented the Company's financial condition, stating:

> The Financial Statements are correct in all material respects and present fairly the condition and operating results of the Company as of the date(s) and during the period(s) indicated therein.

54.     According to the audited financial statements, revenues for 2012 and 2013 were $137.1 million and $103.1 million, respectively. According to the unaudited financial statements, revenues for the first six months of 2014 were $37.9 million, which matched the revenues for the first six months of 2014 reflected in the financial projections. The financial projections reflected expected revenues for 2014 and 2015 of $101.8 million and $109.8 million, respectively, which were similar to – and supported specifically by – the audited revenues for 2013 that Defendants reported. The projections also reflected an expectation that EBITDA (earnings before interest, taxes, depreciation and amortization) would improve as the business developed over time, from approximately break-even in 2013 and 2014 to $26.1 million in 2015.

55.     The term sheet for the Series C Preferred Stock indicated that the pre-money valuation of the Company at the time was $108 million, and that this valuation was derived on the basis of being a multiple of one times the Company's annualized revenues.

56.     In addition to supplying this financial information, Heckman engaged in numerous phone and e-mail conversations with Hernreich, in which Heckman unflinchingly promoted the quality of Scout's business, operations, and financial improvements.

57.     Additionally, Heckman represented to Hernreich that he would have rights superior to those of other Scout investors, and, thus, his investment would entail less risk. For instance, on July 30, Heckman sent an email to Hernreich stating: "Although the term sheet looks complicated, it's uncomplicated for your piece (**first money out, all the top rights**)." (Emphasis added.) Shortly thereafter, Defendants provided Hernreich with a copy of the "investor deck."

58.     On July 29, 2014, Defendants caused Scout to email Hernreich a term sheet for the purchase of Scout's Series C Preferred Stock and a link to a Scout promotional video. Heckman was copied on this email. This video was materially misleading, as it emphasized the Company's print media business comprised of "33 Glossy magazines", including college and pro team magazines, and numerous lifestyle publications, and boasted about its "2.4M Print circulation". Defendants used this video to induce Plaintiffs to invest in Scout despite the fact that they knew that plans were underway to close down the Company's print media business.

59.     Each of the foregoing statements by Defendants was materially false and misleading because such statements (and material omissions) failed to disclose the following: (1) at all relevant times Defendants were in the process of abandoning (and eventually did abandon) the Company's legacy print business, which was its main source of revenue; (2) the Company's CBO system failed to operate properly, which prevented it from billing Scout's existing customers and sustaining the Company's revenue; (3) because of the foregoing, the Company was running out of cash; (4) due to the Company's dwindling cash reserves, it was perpetually on the brink of breaching covenants with its principal lender Multiplier Capital, which would trigger a default and sink the Company;

and (5) Defendants lacked any reasonable basis for their financial projections, which they knew to be false and without reasonable basis.

60.     On the basis of these glowing statements and financial projections and what Hernreich was led to believe was a reasonable equity valuation on the basis of these statements and projections, and without awareness of the material falsity (as described in the preceding paragraph) of those statements and projections, Hernreich caused the Trust to invest $1 million in Series C Preferred Stock on October 24, 2014.

**Defendants Continue to Conceal the Truth**

61.     Defendants continued to fail to disclose to Hernreich that the Company was in a death spiral, though this fact was revealed in internal communications to Company insiders only.

62.     In a July 27, 2014 email, Heckman described the Company's cash and revenue crisis succinctly, stating:

> The issue is, we need to send millions in products, postage and bills to get millions in return[.]
>
> My concern is, **because cash machine stopped, we couldn't pay vendors, which means now, to get cash machine going again, we need more cash. Which isn't happening**[.]
>
> Need to understand how much cash we need to return to normalcy.

(Emphasis added.)

63.     Defendant Stieglitz responded that even if the Company had the cash, the CBO system was not running, so the Company had no way of restoring its failed revenue stream, stating:

> **If CBO was up today we would do that today with cash we have hoarded. But it isn't so I am still hoarding cash in hopes I can pay the next payroll.** The importance of getting CBO fully online is known, it is Bill's #1 priority…

(Emphasis added.)

64.     In an August 5, 2014 email to Heckman and Sornsin, Stieglitz suggested that it "could be the time to exit continuity altogether, and make big changes in Minnetonka." Sornsin responded to this email with a warning that abruptly exiting the legacy print business would be a financial disaster, stating:

> [H]uh? **Walk away from Fosina and continuity without a managed exit, and that $5 million disappears quickly and so does Scout**. We can't wish away A/P, and "big changes in Minnetonka" are limited to a handful of marketing and operations people at this point, **unless you want to stop processing inbound cash.**

(Emphasis added.)

65.     Scout's urgent need for cash was evident in Stieglitz's August 7, 2014 email to Heckman, stating:

> Here's the current look at cash and critical payables. It shows we need the first million investment in the week of August 23 to stay above the Multiplier [Capital] $1mm floor through August.

(Emphasis in original.)

66.     By August 18, 2014, Scout's dwindling cash position had reached a crisis. Having failed to pay rent on the Company's Minnetonka office (where Scout housed its non-sport data center, CBO, and its finance system, EPICOR), the landlord was threatening to declare a default and lock Scout out of the property. Although Heckman refused to pay the rent for the Minnetonka office and wanted to move the Company's computer operations to another location, Stieglitz and Sornsin warned him that it would take months to prepare for such a move. Moreover, Defendants did not even have a replacement office to move these critical systems.

67.     As Sornsin explained:

**100% of our non-sports revenue runs through it**. All continuity, life member, trophy member, DM commerce, Plus our financial systems (Epicor).

**Comparable to Scout's Seattle datacenter, but more complex…. Easily 2 months to move**, including significant testing to avoid total revenue and operational disruption. **And we'll need to drop everything to pull it off**, including taking Tonka engineering off tasks like restoring Continuity, and Plus+Rajesh off of Scout releases.

It**'s also, for the record, high risk to do so simultaneously**. We may encounter something unexpected like Epicor versioning issues, credit card security snafus, etc[.] Our plan had been to do this in stages.

(Emphasis added.)

68.     Although Heckman had instructed Sornsin to terminate most of the Company's Minnesota employees back in May 2014, it appears that prior to receiving Sornsin's August 18 email, Heckman was unaware that the Minnetonka office housed the Company's datacenter, and that the employees he terminated kept those systems running.

69.     Heckman's ignorance of the Minnesota office's mission critical operations is revealed in his August 18, 2014 email response to Sornsin, in which he asked:

Was there not an opportunity to build a new CRM on a cloud-based system? **I'm surprised to read, at this point, that anyone launches an internal data center – I thought we gave that up for lent long ago.**

So are we going to need to support this system with hardware now, going forward?

Knowing Minn[.] was going to be an editorial outpost, why did we not do the code releases, at least in a Seattle office? **This really puts us in a shitty position.** This whole situation just seems crazy to me.

(Emphasis added.)

70.     Sornsin responded that because of the importance of the CBO and EPICOR systems, Minnesota could never have been just an "editorial outpost" until after the Company exited its legacy print business entirely. Moreover, Sornsin emphasized that

migration to another system in a new location for "**a normal company would take 6 months for this.... 2 months in the insane crazy Heckman-company version**. Hopefully not too optimistic, lots of unknowns." (Emphasis added).

71.     Amidst these crises, Defendants sent Hernreich a final draft of the Series C term sheet on August 20, 2014. When Hernreich asked if there were any major changes in this version of the term sheet, Heckman assured Hernreich that his investment would be safe and secure, stating:

> [H]ere's all you need to know: these are the terms Bob Pittman is signing. **[Y]ou can't get any better protection than that.** [H]is personal lawyer drafted the document.

(Heckman email to Hernreich dated August 21, 2014, emphasis added.)

72.     On the basis of Defendants' false assurances, on August 22, 2014, Hernreich signed the term sheet and sent it back to Defendants. Thereafter, on August 25, 2014, Hernreich caused the Trust to transfer to Bank of America, N.A. FAO Wilson Sonsini Goodrich & Rosati the sum of $1,000,000 to be held in escrow until the closing of the Series C Preferred Stock purchase.

73.     Unbeknownst to Hernreich, by the end of August 2014, Scout's cash position had worsened, with only $1.2 million left in the Company's coffers.

74.     Had Defendants disclosed the truth to Hernreich about the Company's rapidly deteriorating cash position, their plan to abruptly exit the Company's legacy print business, the risk of being evicted from the Minnetonka office (which housed the Company's critical CBO and EPICOR systems), and the Company's inability to migrate its computer systems to another location, Hernreich would not have purchased the Company's Series C Preferred Stock.

75.     In late September 2014, Defendants prepared due diligence documents for investors who signed off on the Series C Preferred Stock term sheet. Each of the Defendants reviewed and approved these due diligence documents. Defendants' stated goal in

presenting these documents to investors, including Hernreich, was "to ensure what we are saying here is consistent with what they have been told [about Scout]." (*See* Stieglitz email of September 15, 2014 to Heckman, Rindner, and other Scout personnel).

76.     Among the documents that Defendants provided to Hernreich was a spreadsheet entitled "Use of Proceeds." This spreadsheet represented that the Company expected to raise $15 million from the Series C Preferred Stock sale, of which it would need to use no more than $12,000 by the end of 2015, leaving an investment balance of $3 million. The purported uses of these investment funds were categorized as "Paid Marketing," "Site Acquisition," and "Working Capital." Notably, after the third quarter of 2014 (when $1.5 million was expected to go to working capital), working capital would account for no more than $1 million per quarter.

77.     Defendants' "Use of Proceeds" spreadsheet was false and materially misleading because, as Defendants were aware, Scout was generating hardly any revenue, Scout owed millions to its vendors and it could not restart its billing and revenue generation without paying these debts, and Scout would not be able to operate without the massive infusion of cash from its investors, including Plaintiffs.

78.     By mid-October 2014, Scout was doing everything it could to hide its faltering revenue from investors. In an October 16, 2014 email concerning an upcoming investor call on Scout's September 2014 financial results, Heckman instructed his lieutenants to hide the revenue figures, stating: "I think you need to **prepare a document that does not include last week's revenue**, and say we won't have September numbers prior to signing." (Emphasis added.)

79.     In an effort to excuse the Company's abysmal third quarter 2014 financial results to investors, in an October 17, 2014 email Defendant Rindner suggested that they blame the poor performance on the replacement of the CBO system, "which took longer than expected to become operational on a production basis. This delayed shipments to

members, processing of returns, and issuances of invoices all of which materially reduced continuity commerce revenue between May and August."

80.     However, Rindner's suggested CBO excuse was nothing more than a sham because Defendants were in the process of abandoning the company's direct mail continuity business altogether. As a result, Defendants knew that Scout's continuity business would not come close to meeting the Company's projections for the fourth quarter of 2014 and that it would not even be material to the Company's 2015 financial results.

81.     On October 24, 2014, Hernreich executed the Amended and Restated Preferred Stock Purchase and Option Agreement as Trustee for the Robert E. Hernreich 2005 Trust, which completed the purchase of 396,825 shares of Series C Preferred Stock for the sum of $1 million. This Agreement was countersigned by Defendant Heckman in his capacity as CEO of NAMG/Scout.

**The Series C-1 Preferred Stock Offering**

82.     Throughout the remainder of 2014 and early 2015, Defendants continued to conceal the fact that Scout was on life-support, and that investors' regular infusions of cash were the only thing keeping it alive.

83.     In March 2015, Defendants sought an additional $500,000 investment from Hernreich, and an even more substantial $2,400,000 investment from Serure. In order to secure this investment, Defendants once again provided materially false and misleading financial statements, which Plaintiffs reviewed and relied upon, that concealed the Company's true financial condition.

84.     On the basis of Defendants' glowing statements and financial projections and what Plaintiffs perceived to be a reasonable equity valuation, Hernreich caused the Trust to purchase 198,412 shares of Series C-1 Preferred Stock for the sum of $500,000 on

Case 1:17-cv-06276-GBD   Document 1   Filed 08/18/17   Page 23 of 38

March 24, 2015, and Serure purchased shares of the Company's Series C-1 Preferred Stock for $2,400,000 on September 25, 2015.[4]

85.     However, while Defendants were aggressively soliciting Plaintiffs to make substantial investments in Scout, amongst themselves Defendants acknowledged that the Company's cash position was "precarious" and that obtaining an infusion of cash from investors, including Plaintiffs, was the only thing sustaining it.

86.     For instance, in a March 12, 2015 email, Defendant Rindner stated:

> **[W]e are in a precarious position re cash once payroll is funded this week.** We talked today about extending the Series C for Bobby Hernreich, and he would fund by Monday potentially. We are going down this path even as we pursue the Series C-1 closing as everyone seemed to agree (Mayo and James) that Bobby should get the C's participation rights in any event (and frankly I don't know how we'd tell him that he wouldn't have them if he invested in C-1).

(Emphasis added.)

**Defendants Fraudulently Solicit the Serures' Investments**

87.     Even as Scout was unraveling, Defendants continued to aggressively solicit new investors, including Plaintiffs Ted Serure and Joseph Serure.

88.     Ted Serure and Joe Serure met Heckman in July 2015. At that time, Heckman told the Serures that the Company had over $100 million in sales annually, not including its online business. However, Heckman failed to disclose to the Serures the fact that Defendants were shutting down the Company's print media business, and also failed to disclose the Company's dire cash shortage. During their initial meeting, Heckman invited Ted Serure and Joe Serure to tour Scout's offices so that they could see the Company's operations firsthand. The Serures took Heckman up on the offer and visited Scout prior to Serure making an investment in Scout.

---

[4] The issuance of 7,936,507 shares of the Company's Series C-l Preferred Stock was authorized under Scout's Amended and Restated Certificate of Incorporation, which was adopted on March 24, 2015.

89.     In order to win the Serures' trust in Scout management, in September 2015 Heckman introduced the Serures to Robert "Bob" Pittman, a well-known global media and entertainment business leader, who gained prominence as leader of the team that created MTV (eventually becoming its President), and is currently the CEO of iHeartMedia, Inc. (formerly known as Clear Channel Communications). Pittman told the Serures that he had confidence in Heckman, and that he had invested $9 million in Scout through his private investment firm, Pilot Group LLC.

90.     Shortly after their meeting, Heckman caused Scout to provide the Serures a deck of information that included a Summary of Key Principal Terms for a new convertible debt offering, and historical financials and projections, which included financials reflecting Scout's defunct print media business. This solicitation culminated in the Serures' purchase of $2.4 million in Preferred C-1 Stock on September 25, 2015.

91.     The Serures purchased their stake in Scout through an investment vehicle called Scout Investment, LLC (the "LLC"), which was created and controlled by Bob Pittman, Heckman and Rindner. Through the LLC, Defendants represented that investors could invest in Scout on the "same terms of the Series C-1 Preferred," which was priced on October, 2014 as part of a "$25MM round, fully funded." As Rindner explained in a September 16, 2015 email to Joe Serure, "the purpose of the [Scout Investment] LLC is to buy equity of Scout."

92.     At all times relevant to this action, Defendants Heckman and Rindner were on the Board of Managers of the LLC, who, pursuant to the LLC's Limited Liability Company Agreement (the "LLC Agreement"), were "granted, the full and complete power, authority and discretion" to manage, operate and control the business and affairs of the LLC, and Heckman and Rindner did, in fact, exercise such authority and control over the LLC.

93.     Defendants provided Serure a Term Sheet concerning the Scout securities that Serure purchased through the LLC, stating:

**Term**

10 years from the initial capital call date (the "Activation Date"), subject to 2 one-year extensions at the Managing Members discretion.

**Shares**

Shares participating and with 2x liquidation preference. Shares are pari-passu with the Series C and senior to every other outstanding class of equity security.

**Rights**

Voting rights and economic interests of Member Interests are decoupled. Fund Interests owned by the Members will be controlled by the Fund's Board ("Board"), which is led by Bob Pittman, James Heckman and controlled by Bob Pittman. The Series C-1 shares vote as a class and have significant approval rights as set forth in the Company's certificate of incorporation. Customary information rights and the Company's Bylaws provide for a right of first refusal in favor of the Company.

**Fees and Expenses**

No management fee will be charged to the LPs. Expenses and legal fees of the LLC will be reimbursed.

**Carried Interest**

15% of Net Profits, as defined in LLCA, may be allocated by the Board.

**Distributions**

Distributions for any investment will be made as follows:
> • 100% to the Members until they have received an amount of distributions equal to the aggregate capital contributions made to date plus expenses.
> • Thereafter, up to 85% to the Members and 15% at the discretion of the Board

*Bob Pittman's investment and Investment by employees or affiliates of Scout Media Holdings, Inc. in the Fund will not be subject to any carried interest charge.*

(Emphasis in original.) Defendants used this Term Sheet to persuade Serure that it would have rights superior to those of other Scout investors, and, thus, its investment would entail less risk.

94.     On the basis of the false and misleading statements, material omissions and projections made to Serure, as alleged herein, and what Serure was led to believe was a reasonable equity valuation on the basis of these statements and projections, and without

awareness of the material falsity of those statements and projections, Serure purchased $2.4 million in Scout securities on September 25, 2015.

95.     In December 2015, Heckman was still hyping Scout's purported success. For instance, in a December 14, 2015 email Heckman told Hernreich: "Wanted to give you an update on your investment in Scout – significant movement forward, all positive for you personally, after a really aggressive transition." Heckman went on to describe the closing of an $8 million bridge loan the prior week and the recapitalization of the Company that, according to Heckman, resulted "in <u>increased equity for you and other recent investors (250%)</u>. (Emphasis in original). Heckman also claimed, "Scout can now move forward with strategic funding, as our growth continues at a steady pace." Finally, Heckman touted Ross Levinsohn's new leadership of the Board, saying: "[W]e now have control of the company (between management and his fund, we have majority of the shares), and the board is now led by Ross Levinsohn as sole chairman. There is no bad news for you."

96.     Heckman also continued to solicit additional investments from Serure, and regularly sent the Serures email updates about Scout's purported lucrative deals. For instance, in a January 7, 2016 email to Ted Serure, Joe Serure and Richard Serure, Heckman touted Scout's partnership with Bob Pittman's company, iHeartMedia, claiming that "Scout and iHeart's distribution and sales alliance will allow Scout to grow our network audience, boost brand awareness and increase advertising revenue by utilizing iHeartMedia's vast, multi-platform reach of 245 million monthly users in 150 markets as well as their $4B advertising infrastructure… Scout is now part of that network, and their head of digital sales is now personally responsible for driving Scout sales (which they see as much greater growth opportunity than incremental growth to an already saturated music offering)." Heckman also sent emails to the Serures touting a new partnership between Scout and Sports Illustrated.

97.     Also in January 2016, Heckman introduced the Serures to Levinsohn, who was extremely upbeat about Scout's business and prospects, but failed to disclose the closure of the legacy print media business, its faltering revenues, or its dire cash position.

98.     In January 2016, the Serures were informed by Defendants that their investment through the LLC would be converted into part of a Bridge Financing. The Bridge Financing was planned to raise $13 million, and, after this transaction, would represent roughly 61% ownership of the Company. Defendants in a January 5, 2016 email explained the Bridge Financing to the Serures, stating:

> Your initial investment has been restructured as part of the bridge, whereby the Pilot ownership stake has been substantially reduced and the Series C investors' stake correspondingly increased. As a result, the ownership stake from the initial investment of $2.4mm has increased from 1.7% to 3.8% of the Company, as the Series C investment of $30mm represented 48.0% ownership stake, or a $62.5mm valuation ($2.4mm ÷ $62.5 = 3.8%).

99.     On June 8, 2016, Defendants caused the Company to email to Ted Serure the Scout Investment LLC Limited Liability Company Agreement of July 9, 2015, and Amendment to the Scout Investment, LLC Agreement. Upon receipt of this agreement, Ted Serure requested detailed information concerning the Company's capitalization, including the identities of all investors in the Company and each of their respective ownership interests in the Company.

100.    In response to this request, on June 9, 2016, Defendants provided an abbreviated capitalization table. Upon receipt of this capitalization table, Ted Serure inquired as to where his personal investment and percentage ownership of the Company was reflected in this table. The Company responded through its representative, Amir Shibli, who revealed that the Serures' investment in Scout had been converted to an indirect investment through Scout LLP / Heckman / Pittman Fund.

101.    On July 28, 2016, Defendants caused the company to email the Serures and Hernreich "the latest cap[italization] table, which showed all investors in the Company's

Series C, C-1 and the Bridge. This table reflected Defendants' plan to raise up to $13 million in the Bridge financing transaction. As described in the footnotes to this table, the Bridge was to be converted into a "Participating Preferred Security which receives its Principal plus 12% PIK interest and then, receives its % ownership interest[.]" "PIK interest" refers to payment-in-kind interest, which is a financial instrument (such as a bond or preferred stock), that pays interest or dividends to holders of such securities in the form of additional securities or equity rather than cash.

102.    Also on June 28, 2016, Defendants caused Scout to email Plaintiffs an Investor Deck and an Executive Summary, purporting to report, in part, the Company's then-current business strategy and financial position. In particular, the Investor Deck falsely represented to Plaintiffs that Scout had a valuation of $108 million in 2014, and $123 million in 2015.

103.    The Executive Summary reported that for 2015 Scout had total revenue of $17.1 million and gross profit of $12.5 million. Although Defendants disclosed that Scout operated at a loss of $8.3 million and had "Post-Investment" EBITDA loss of $16.1 million, Defendants portrayed such losses as the necessary consequence of their growth strategy that required large on-going investments, but would make the Company highly profitable by 2017, stating:

> The Company has invested heavily into its growth (i.e., engineering team, sales operations, a studio, and senior management team, etc.) rather than slowly building a profitable Company. This investment has driven the platform's growth over the last two years, as evidenced by the rapid growth in revenue, unique users, CPMs, video views, and app downloads.

The Executive Summary, which Plaintiffs reviewed and relied upon, failed to disclose that Scout was nearly out of cash; that due to the Company's dwindling cash reserves, it was on the brink of breaching covenants with its principal lender, Multiplier Capital, which would trigger a default and sink the Company; and that Defendants lacked any reasonable basis for their financial projections, which they knew to be false.

104.    On July 30, 2016, Defendants caused Scout to send the Serures an email with an updated capitalization table that reflected the conversion of the Series C and C-1 preferred to a bridge. (On August 1, 2016, Defendants forwarded this table to Hernreich). The table was constructed on the basis of certain assumptions, including a valuation of the Company prior to the Bridge financing transactions of $108 million.

105.    Each of the statements Defendants made to Plaintiffs in order to induce them to purchase shares of the Series C-1 Preferred Stock was materially false and misleading because such statements (and material omissions) failed to disclose the following: (1) at all relevant times Defendants were planning to abandon (and eventually did abandon) the Company's legacy print business, which was its main source of revenue; (2) the Company's CBO system failed to operate properly which prevented it from billing Scout's existing customers and sustaining the Company's revenue; (4) because of the foregoing, the Company was running out of cash; (5) due to the Company's dwindling cash reserves, it was perpetually on the brink of breaching covenants with its principal lender Multiplier Capital, which would trigger a default and sink the Company; and (6) Defendants lacked any reasonable basis for their financial projections, which they knew to be false.

## THE TRUTH BEGINS TO EMERGE

106.    In July 2016, Hernreich read in the media that Heckman had been fired by the Board for cause, and that the entire "platform team" had resigned. Hernreich naturally became very concerned about what that meant about the condition of the Company's business and financial situation and the prospects for both the Company and the Trust's investment in the Company. Hernreich subsequently engaged in conversations with people both inside and outside the Company and came to the conclusion that starting in the spring of 2014, and continuing for up to a year or more thereafter, Heckman engaged in wanton, willful and/or reckless acts as the Chief Executive Officer of the Company and destroyed

the Company's core NAMG print (non-digital) media business, and in the process lost most of the Company's customers and business records, including billing and accounts receivable records, thus preventing the Company from billing and collecting from business partners who owed the Company substantial sums. From annualized revenues exceeding $100 million, Scout's 2016 revenues were then expected to amount to approximately $26 million.

107.    Defendants were aware of this effective elimination of the core business of Scout in the spring of 2014 or within the following several months, and the drastic decline in the Company's financial results and prospects that resulted. Nevertheless, Defendants continued to tout the operational success and financial health of the Company, and they continued to promote the Company's prospects as if the NAMG business and $80 million or more of annualized revenues were expected to be realized when they knew that the NAMG business had essentially evaporated and was unrecoverable.

108.    In spite of this knowledge, Defendants' solicited Plaintiffs to invest in the Company's Series C and Series C-1 Preferred Stock investment rounds in October 2014, March 2015, and September 2015, all the while covering up the true state of distress the Company was in, and the fact that the financial results for the second half of 2014 and all of 2015 would wind up looking nothing like what Defendants were promoting in the financial projections given to Plaintiffs.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED ECONOMIC LOSS TO PLAINTIFFS

109.    The foregoing allegations describe Plaintiffs' general theory of damages, demonstrate that Plaintiffs' damages were caused by the scheme to defraud as alleged herein, and negate any negative inference that Plaintiffs' losses were the result of general market conditions or other factors wholly unrelated to the false and misleading information complained of herein. Upon further investigation and expert analysis, Plaintiffs may assert

that there were additional fraudulent activities that caused or contributed to the damages Plaintiffs incurred.

## ADDITIONAL SCIENTER ALLEGATIONS

110.    As alleged herein, Defendants acted with scienter in that Defendants knew that the financial documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to Plaintiffs; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Scout, their control over, and/or receipt and/or modification of Scout's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Scout, participated in the fraudulent scheme alleged herein.

111.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to Plaintiffs. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

112.    In particular, Heckman, Sornsin, Rindner and Stieglitz had actual knowledge of Scout's dire cash position at least as early as July 2014, but conspired amongst themselves to conceal this information from Plaintiffs. Additionally, Defendants knew about the crisis involving the CBO and EPICOR systems, as well as the detrimental impact that the failure of these systems would have on the Company's ability to sustain its revenue streams, but they concealed this material information from Plaintiffs as well.

113.    Instead of disclosing the truth about the Company's financial condition and prospects, each of the statements Defendants made to Plaintiffs in order to induce them to

purchase shares of Scout securities was materially false and misleading because such statements (and material omissions) failed to disclose the following: (1) at all relevant times Defendants were planning to abandon (and eventually did abandon) the Company's legacy print business, which was its main source of revenue; (2) the Company's CBO system failed to operate properly which prevented it from billing Scout's existing customers and sustaining the Company's revenue; (3) because of the foregoing, the Company was running out of cash; (4) due to the Company's dwindling cash reserves, it was perpetually on the brink of breaching covenants with its principal lender Multiplier Capital, which would trigger a default and sink the Company; and (5) Defendants lacked any reasonable basis for their financial projections, which they knew to be false.

## NO STATUTORY SAFE HARBOR

114. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Scout who knew that those statements were false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against Defendants Heckman, Stieglitz, Rindner, and Sornsin)

115.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

116.     At all relevant times, Defendants Heckman, Stieglitz, Rindner, and Sornsin carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase Scout securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

117.     Defendants Heckman, Stieglitz, Rindner, and Sornsin: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants Heckman, Stieglitz, Rindner, and Sornsin are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

118.     Defendants Heckman, Stieglitz, Rindner, and Sornsin, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Scout as specified herein.

119.     Defendants Heckman, Stieglitz, Rindner, and Sornsin employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Scout value and performance and continued substantial growth,

33

which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Scout and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Scout securities.

120.   Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Defendants Heckman, Stieglitz, Rindner, and Sornsin were high-level executives at the Company and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to Plaintiffs which they knew or recklessly disregarded was materially false and misleading.

121.   Defendants Heckman, Stieglitz, Rindner, and Sornsin had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Scout's operating condition and future business prospects from Plaintiffs and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's business, operations and earnings, Defendants Heckman,

Stieglitz, Rindner, and Sornsin, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

122.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the sales price of Scout securities was artificially inflated at the times Plaintiffs purchased such securities. In ignorance of the fact that sales prices of Scout's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants Heckman, Stieglitz, Rindner, and Sornsin, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants Heckman, Stieglitz, Rindner, and Sornsin but not disclosed to Plaintiffs, Plaintiffs acquired Scout securities at artificially high prices and were damaged thereby.

123.   At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth regarding the problems that Scout was experiencing, which were not disclosed by Defendants Heckman, Stieglitz, Rindner, and Sornsin, Plaintiffs would not have purchased their Scout securities, or, if they had acquired such securities, they would not have done so at the artificially inflated prices which they paid.

124.   By virtue of the foregoing, Defendants Heckman, Stieglitz, Rindner, and Sornsin have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

125.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases of the Company's securities.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### (Against All Defendants)

126.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

127.    Defendants acted as controlling persons of Scout within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements disseminated to Plaintiffs, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

128.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

129.    Defendants Heckman, Stieglitz, Rindner, and Sornsin each had the power to influence and control and did influence and control, directly or indirectly, the Company's communications with Plaintiffs and each was intimately involved in creating and publishing the false and misleading statements and material omissions alleged herein. Moreover, Heckman, Stieglitz, Rindner, and Sornsin each had numerous opportunities to disclose the true facts to Plaintiffs during conference calls, in-person meetings, and in email communications with Plaintiffs, but each of them failed to do so.

130.     Defendant Levinsohn has served in senior executive positions at numerous public and private corporations, including serving as CEO of Yahoo in 2012 and President of Fox Interactive Media, as well as senior executive positions at HBO, AltaVista, and News Corp. Levinsohn has also served on the boards of several public and private media and technology companies including Tribune Media, Maven, Dex Media and Vubiquity and Mundo Media.  Based on his extensive experience as an officer and director of major corporations, Levinsohn is intimately familiar with the duties and responsibilities of the Chairman, including acting as a liaison between management and the Board, providing independent advice and counsel to the CEO, keeping abreast generally of the activities of the Company and its management, ensuring that the Directors are properly informed and that sufficient information is provided to enable the Directors to form appropriate judgments, identifying risk areas and overseeing risk management, ensuring the integrity of published financial statements, protecting Company assets and reputation, representing the interest of shareholders, and ensure the Company complies with laws and codes. However, Levinsohn failed to discharge these obligations and responsibilities.

131.     In particular, in his position as Chairman of Scout, Levinsohn had the power and ability to control and influence Heckman, Stieglitz, Rindner, and Sornsin, and to ensure that their communications with Scout investors were truthful and not misleading, but failed to do so. Levinsohn also had an obligation to ensure that Scout's officers did not engage in violations of the federal securities laws, but failed to do so.

132.     As set forth above, Defendants Heckman, Stieglitz, Rindner, and Sornsin each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, all Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's securities.

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

a)  Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b)  Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

c)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 18, 2017

Respectfully submitted,

By:   /s/Russell D. Paul
    Russell D. Paul

**BERGER & MONTAGUE, P.C.**
Todd S. Collins, Esq. (*Pro Hac* Anticipated)
Eric Lechtzin, Esq. (*Pro Hac* Anticipated)
Russell D. Paul, Esq.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Phone: (215) 875-3000
Fax: (215) 875-4604

*Counsel for Plaintiffs*